**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL BENSON, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | **Case No.** |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| CROSSMARK, INC. and ACOSTA, INC., | ) | |
| | ) | |
| *Defendants.* | ) | |

**COMPLAINT**

COMES NOW, Plaintiff, Michael Benson, by and through his attorneys, and for his Complaint against the Defendants, Crossmark, Inc. and Acosta, Inc., states as follows:

**NATURE OF THE CASE**

1. Plaintiff complains pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and the Missouri Human Rights Act, R.S.Mo. 213.010 *et seq*. ("MHRA") and seeks damages to redress the injuries he has suffered as a result of being discriminated against by Defendants and denied employment based on his race (Black) as well as in retaliation for complaining of discrimination and retaliation.

**JURISDICTION AND VENUE**

2. Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c)(2) as it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

**PROCEDURAL PREREQUISITES**

4. On July 17, 2025, Plaintiff filed charges of discrimination and retaliation with the Missouri Commission on Human Rights ("MCHR"). A true and correct copy of Plaintiff's charge

is attached as Exhibit 1 and incorporated here by reference.

5. On June 29, 2026, Plaintiff received a Notice of Right to Sue (dated the same day). A true and correct copy of the Notice of Right to Sue is attached as Exhibit 2 and incorporated here by reference.

6. This action was commenced within 90 days of receipt of said Notice of Right to Sue.

## PARTIES

7. At all times relevant, Plaintiff Michael Benson ("Plaintiff") was and is a resident of the State of Missouri, City of St. Louis.

8. At all times relevant, Defendant Crossmark, Inc. ("Defendant Crossmark") was and is a general business for-profit foreign corporation, duly existing pursuant to, and by virtue of, the laws of the State of Missouri, with its principal place of business located at 1921 State Highway 121, Ste. #100, Lewisville, TX 75056.

9. At all times relevant, Defendant Acosta, Inc. ("Defendant Acosta") was and is a general business for-profit foreign corporation, duly existing pursuant to, and by virtue of, the laws of the State of Missouri, with its principal place of business located at 6651 Gate Pkwy, Suite 1, Jacksonville, FL 32256.

10. At all times relevant, Defendant Crossmark and Defendant Acosta shall be herein referred to together as "Defendants."

11. At all times relevant, Defendants were employers within the meaning of the MHRA.

## MATERIAL FACTS

12. In or around November 2023, Plaintiff began working for Defendant Crossmark as

a Retail Client Merchandising Representative on its Ferrero team, reporting directly to Perry Hoeven ("Hoeven"), Retail Supervisor. As a Retail Client Merchandising Representative, Plaintiff was responsible for visiting stores in the St. Louis, Missouri area that sold Ferrero brand chocolates (namely gas stations and convenience stores) to discern which products were physically on the shelves to be sold.[1]

13. Throughout his employment, Plaintiff was an above-average employee and routinely received compliments for his work performance.

14. In or around late-March 2024, when Hoeven started accompanying Plaintiff on his store visits, Plaintiff noticed that there was a radical difference in the way in which Hoeven interacted with Black store staff as opposed to how he addressed Caucasian store staff. While Hoeven was always disrespectful to the Black staff in what he referred to as "those kind of stores" – food mart/liquor store type locations, most of which are Black owned and operated – Hoeven was always friendly and professional when interacting with Caucasian staff at suburban locations. In fact, although Hoeven had a habit of moving products around Black owned and operated stores without their permission, when Plaintiff and Hoeven visited stores in suburban areas with only Caucasian store staff, Hoeven never moved or touched anything without prior permission, even telling Plaintiff to "make sure you get permission before moving anything."

15. In or around April 2024, after Plaintiff observed Hoeven harass and discriminate against his coworker, Kenny Jackson ("Jackson"), due to Jackson's race (Black), Plaintiff helped Jackson file formal complaints with Defendant Crossmark's Human Resources concerning

---

[1] When Plaintiff began working for Defendant Crossmark, he was also employed by Defendant Acosta through its subsidiary, Mosaic Sales Solutions US Operating Co., LLC ("Mosaic"), where he had been working as a Retail Sales Representative on Mosaic's "Tracfone wireless program" since in or around April 2016.

Hoeven's race-based discrimination.

16. After Hoeven learned that Plaintiff was assisting Jackson complain about Hoeven's discrimination, Hoeven began to retaliate against Plaintiff and Jackson by abruptly imposing non-existent and fabricated policies – such as an early start time – that were only applied to Plaintiff and Jackson and not applied to anyone else.

17. In or around June 2024, Plaintiff complained to William Wade ("Wade"), Hoeven's supervisor, about Hoeven's race-based discrimination and retaliation, including mandating that only Plaintiff and Jackson start at a particular time contrary to company rules as well as the difference in the way Hoeven treats Black store owners as compared to Caucasian store owners.

18. On September 18, 2024, after Defendant Acosta formally acquired Defendant Crossmark, Kim Bonya (Plaintiff's supervisor at Mosaic) reached out to Plaintiff to advise him that, according to Defendant Acosta's HR Business Partner named Bernadette Blue ("Blue"), Plaintiff had to pick one job or the other but "dual employment" within Defendant Acosta was prohibited.

19. Also on September 18, 2024, Plaintiff attended a phone conference between Jackson and Hoeven as Jackson's witness. Plaintiff's presence was announced on the call. Following the call, Plaintiff continued to assist Jackson with his claims for harassment, discrimination, disparate treatment, and hostile work environment against Hoeven.

20. On September 24, 2024, Plaintiff notified Defendants of his decision to resign from his position working for Defendant Crossmark, effective October 19, 2024, while continuing to work for Defendant Acosta's other subsidiary, Mosaic.

21. On October 15, 2024, Hoeven called Plaintiff and told him that it would be his last day because Defendant Crossmark had purportedly decided to accept his resignation early and he

did not need to return to work.

22. On December 17, 2024, Defendant Acosta announced that Mosaic's Tracfone wireless program was ending at the close of 2024 and that Plaintiff's entire team (70-100 employees) would be laid off, effective December 31, 2024.

23. At the same time, Defendant Acosta gave Plaintiff six (6) months to secure another position at any of its subsidiaries, which would allow him to bridge his tenure and retain his benefits from Defendant Acosta.

24. Accordingly, on February 19, 2025, Plaintiff applied for a part-time Retail Sales Representative position on Defendant Crossmark's Ferrero team in St. Louis under Hoeven. This was essentially the same position that Plaintiff had already successfully performed for approximately one (1) year before voluntarily resigning from this position.

25. However, on March 4, 2025, although Plaintiff was clearly qualified for this position, Defendants notified Plaintiff via email that it "decided to pursue other candidates." Plaintiff later learned that Hoeven, as team leader, had made the decision not to move forward with Plaintiff's application.

26. On March 11, 2025, Plaintiff applied for another Retail Sales Representative position on Defendant Crossmark's Ferrero team but this time was told by Defendant Crossmark's recruiter, Andrea Moss ("Moss"), that "We just filled the position in St. Louis that you live in. … The only other open position in St. Louis area is on the IL side (Granite City). They are requiring reps to live in the IL side of the territory." Plaintiff knew this to be false since he previously worked with sales representatives living in St. Louis, MO but working in the Granite City, IL territory. Not surprisingly, Moss also subsequently confirmed to Plaintiff that Hoeven was the person who insisted on this Illinois residency requirement.

27. On March 12, 2025, realizing that Hoeven was retaliating against him and preventing him from being rehired, Plaintiff sent an email to Defendants' Employee Relations and Human Resources in which he expressed concerns about Defendants' refusal to rehire him and stating:

> I firmly believe that I am being retaliated against by Perry Hoeven for my assistance in serving as a witness in another former employee's claims of harassment and discrimination.

28. On April 2, 2025, Stephanie Williams ("Williams"), Defendant Acosta's Human Resources Senior Business Partner, emailed Plaintiff to notify him that:

> [T]he case you escalated has been closed. Your concern involved not being offered a role, which you believed was in retaliation for your participation in a previous investigation. After a thorough review, I found no evidence of retaliation.

Plaintiff was devastated to receive this email, as it was clear that Hoeven was successfully able to prevent him from securing another position solely in retaliation for his previous protected activities.

29. Also on April 2, 2025, eager to get a job, Plaintiff nonetheless applied for another Retail Sales Representative position on Defendant Crossmark's Ferrero team in St. Louis, MO. While Defendants confirmed receipt of the application, Defendants never followed up with Plaintiff as to the status of his application.

30. On April 16, 2025, Plaintiff applied for yet another Retail Sales Representative position on Defendant Crossmark's Ferrero team in St. Louis, MO.

31. On April 22, 2025, another one of Defendant Crossmark's recruiters named Tracy Baker ("Baker") informed Plaintiff that Defendant decided not to proceed with his application for "Unavailable Variable" as a "result of our current hiring needs." When Plaintiff replied and asked "What position is this for? The email doesn't specify," Baker suspiciously refused to respond.

Once again, it seemed that Hoeven was successfully interfering with Plaintiff's ability to secure a job in retaliation for his complaints of Hoeven's discrimination and retaliation.

32. On May 20, 2025, Plaintiff applied for another full-time Retail Sales Representative position on Defendant Crossmark's Ferrero team in St. Louis, MO. While Defendants confirmed receipt of the application, Defendants wholly failed to follow up with Plaintiff as to the status of his application.

33. On July 17, 2025, Plaintiff applied for a Retail Merchandiser position, this time on Defendant Crossmark's General Mills team, also in St. Louis, MO. While Defendants confirmed receipt of the application, Defendants never followed up with Plaintiff as to the status of his application.

34. On August 29, 2025, Plaintiff applied for another Retail Sales Representative position on Defendant Crossmark's Ferrero team in St. Louis, MO. While Defendants confirmed receipt of the application, Defendants refused to follow up with Plaintiff as to the status of his application.

35. On October 8, 2025, Plaintiff applied for another Retail Sales Representative position on Defendant Crossmark's Ferrero team in St. Louis, MO. While Defendants confirmed receipt of the application, Defendants again failed to follow up with Plaintiff as to the status of his application.

36. On November 10, 2025, Plaintiff applied for another Retail Sales Representative position on Defendant Crossmark's Ferrero team in St. Louis, MO.

37. On December 17, 2025, in connection with Plaintiff's November 10, 2025 job application, Defendants emailed him to inform him that a recruiter will review his application and get back to him if there is a fit. Not surprisingly, nobody ever contacted Plaintiff again regarding

this position.

38. On January 7, 2026, Plaintiff applied for another Retail Sales Representative position on Defendant Crossmark's Ferrero team in St. Louis, MO. While Defendants confirmed receipt of the application, Plaintiff never again heard from Defendants regarding this application.

39. As such, on February 13, 2026, Plaintiff sent an email to Defendant Crossmark's Recruiting Department (recruiting@crossmark.com) in which he stated, "This is a formal request for an application update. Please provide me with an update on the following [January 7, 2026 Retail Sales Representative] job application." Defendants still refused to respond to Plaintiff.

40. On June 15, 2026, Plaintiff applied for another Retail Merchandiser position on Defendant Crossmark's General Mills team in St. Louis, MO.

41. On June 18, 2026, Defendant Crossmark's recruiter named Brandy Reed ("Reed") interviewed Plaintiff over the phone for the Retail Merchandiser position, after which Reed informed Plaintiff that a hiring manager would reach out to him shortly.

42. However, on July 1, 2026, before any hiring manager reached out, Reed emailed Plaintiff to notify him that:

> I wanted to provide you with an update regarding the position. Our client had already scheduled interviews before we spoke and has decided to move forward with one of those applicants. As a result, they are no longer considering additional candidates for this role.

43. On July 9, 2026, Plaintiff applied for a Retail Sales Merchandiser - Grocery position on Defendant Crossmark's CPG team in St. Louis, MO. To date, Defendants have failed to even contact Plaintiff with respect to this job application.

44. The only reasonable explanation for Defendants' behavior is that Defendants made the decision to automatically reject each and every job application that Plaintiff submits solely in retaliation for him assisting Jackson file complaints of discrimination as well as filing his own

complaints of retaliation.

45. But for Plaintiff assisting Jackson file complaints of discrimination as well as filing his own complaints of retaliation, Defendants would have rehired Plaintiff.

46. Plaintiff's performance was, upon information and belief, above average during the course of his employment with Defendants.

47. The above are just some of the acts of disparate treatment and retaliation that Plaintiff has experienced at the hands of Defendants.

48. Defendants' actions and conduct were and are intentional and intended to harm Plaintiff.

49. As a result of Defendants' discrimination and retaliation, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

50. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails.

51. Defendants' conduct was and is malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands Punitive Damages.

52. Plaintiff demands trial by jury on all counts so triable.

## COUNT I
## FOR RETALIATION IN VIOLATION OF SECTION 1981

53. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

54. Defendants violated Section 1981 by retaliating against Plaintiff for his protected complaints and opposition to Hoeven's discrimination on the basis of race as well as his retaliation, by, inter alia, denying Plaintiff employment and refusing to rehire him.

55. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

**WHEREFORE**, Plaintiff respectfully requests a judgment in his favor on Count I of the Complaint against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Section 1981 in that Defendants have retaliated against Plaintiff causing him to suffer damages;

B. Awarding economic damages to Plaintiff resulting from Defendants' unlawful retaliation and to otherwise make him whole for any losses suffered as a result of such retaliatory employment practices;

C. Awarding Plaintiff compensatory damages for mental and emotional distress, pain and suffering and injury to his reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

**COUNT II**
**FOR RETALIATION IN VIOLATION OF THE MHRA**

56. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

57. Defendants violated the MHRA, R.S.Mo. 213.070(1)(2), by refusing to rehire Plaintiff solely in retaliation for his complaints of race discrimination and retaliation.

58. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the MHRA, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

**WHEREFORE**, Plaintiff respectfully requests a judgment in his favor on Count II of the Complaint against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Section 1981 in that Defendants have retaliated against Plaintiff causing him to suffer damages;

B. Awarding economic damages to Plaintiff resulting from Defendants' unlawful retaliation and to otherwise make him whole for any losses suffered as a result of such retaliatory employment practices;

C. Awarding Plaintiff compensatory damages for mental and emotional distress, pain and suffering and injury to his reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: September 18, 2026

**MATHIS, MARIFIAN & RICHTER, LTD.**

By: /s/ Laura E. Schrick________________
Laura E. Schrick, Esq., #56713 MO
23 Public Square, Suite 300
PO Box 307
Belleville, IL 62220
Ph: (618) 234-9800, ext. 270
Email: lschrick@mmrltd.com

-and-

WHITE & HILFERTY

By: /s/Michael P. Hilferty (w/consent)___
Michael P. Hilferty, Esq.
(Pro Hac Vice Pending)
Bianca P. Acquaviva, Esq.
(Pro Hac Vice Pending)
757 Third Avenue, 20th Fl.
New York, NY 10017
Ph: (646) 698-8890
Email: mph@nycjobattorney.com
acquaviva@nycjobattorney.com

*Attorneys for Plaintiff Michael Benson*